**RAMLO LAW**
Kurt Ramlo (SBN 166856)
15021 Ventura Blvd. #544
Los Angeles, CA 91403
RamloLegal@gmail.com
Telephone: (310) 880-9208

Attorney for Creditor Matthew Peridis

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re<br><br>Christopher Scott Ford,<br><br>Debtor. | Case No. 2:26-bk-12720-NB<br>Hon. Neil Bason<br><br>Chapter 13<br><br>**Declaration of Matthew Peridis in Support of Updated Objection to Debtor's Proposed Plan**<br><br>Hearing Date: ~~August 6, 2026~~<br>Hearing Time: 9:30 a.m.<br>Courtroom: 1545 Floor: 15th<br>Via ZoomGov Video<br>Via ZoomGov Telephone |

I, Matthew Peridis, declare:

1. I am over the age of eighteen years and understand and believe in the obligations of an oath or affirmation.

2. I met Chris Ford in 2014, when we began a romantic relationship. In or about 2015, he moved into my condo and began living together.

3. In 2016, Chris started a business called "Butter Love & Hardwork". His business created breakable chocolate sculptures for influencer press mailers.

4. I purchased my current residence in 2017. Chris did not contribute to the purchase price. We moved from the condo to the house once escrow closed on my purchase of the house. Chris began conducting part of his business out of my residence, without obtaining a business

license or checking on whether it was legal for him to do so.

5. In about 2017, Chris began to engage in daily excessive drinking of alcohol, about a half to a whole bottle of vodka daily, which lead to arguments and problems in our relationship.

6. In early 2018, Chris and his business became famous when Kim Kardashian hired them to replicate the shape of her perfume bottles in a breakable chocolate sculpture for the successful launch of her new perfume, Kimoji Hearts Fragrance. The chocolate sculptures hid smaller perfume bottles inside with the new fragrance, leaving the recipients to break over the chocolate sculpture. Kardashian purportedly sent them to a massage list of celebrities, friends, and “haters.” One article about his project with Kim Kardashan is here: https://www.elle.com/beauty/a16581681/kim-kardashian-kimoji-hearts-fragrance-cake/

7. His business became so successful that he quit his job as an executive pastry chef for the Four Seasons Beverly Wilshire to focus solely on his own business. He was able to hire several employees to help scale the business. Movie studios, clothing brands, beauty brands, and countless other markets flocked to hire Butter Love & Hardwork to do the same for them as he had done for Kim Kardashian. It was so successful that Kylie Jenner also hired him to do the launch of one of her lip care products. Each of these projects would bring in from $20,000 to $50,000. All of this occurred in a matter of a few months.

8. In June of 2018, Chris incorporated his business as “BLHW, Inc.”

9. According to 2019 tax records, that S-corporation purportedly grossed $318,202, after $151,246 of cost of goods sold and $136,334 in deductions including $96,000 for officer compensation. It is my understanding that in 2019 Chris was the sole officer of BLHW, Inc.

10. In around 2018 or 2019, Chris began to have part-time employees or workers at my residence. In January 2019, he decided that he needed more space and started conducting most of his business from a small rental space.

11. In 2019, I began having a one-bed, one-bath ADU constructed on the backyard of my property. I intended to use it to generate rental income and not for Chris’ business. The ADU was completed in 2020.

12. Chris, however, demanded that he be allowed to conduct his business in the ADU. He turned the ADU into a semi-industrial kitchen facility, demanding that I install high voltage

outlets to accommodate his thousands of dollars' worth of equipment.

13. Chris never paid me any rent or for any utilities for his use of the ADU even though by then he was telling me that he was grossing $500,000 a year.

14. Chris and I married on January 3, 2020.

15. In 2020, BLHW, Inc. grossed $352,806, with $172,753 of cost of goods sold and $55,119 in deductions but no deductions for officer compensation or for salaries or wages, resulting in $124,934 of ordinary business income.

16. At this time, Chris was buying countless Louis Vuitton bags, purses, duffle bags, even a $100,000 full sized trunk. He bought $10,000 fur coats from Louis Vuitton and countless other luxury clothing items, shoes, and watches. I compiled a list of those purchases, showing that in 218 transactions from January 17, 2020 through January 18, 2023, he purchased $520,594.07 of luxury goods from Louis Vuitton, Gucci, Fendi, Chanel, Yves Saint Laurent, Mitsukoshi Ginza Tokyo, Rosso Corsa, Burke Décor, Williams-Sonoma, Richemont Inc., Balenciaga, Alexander McQueen, Acne Studio, and other retailers.

17. Later in 2020, Chris was diagnosed with depression and started taking prescription anti-depressant drugs.

18. In July 2021, decided that he needed a larger space. He found a large warehouse in Inglewood and decided that he could get a loan to convert the space into an industrial kitchen and warehouse. He tried securing a loan through banks who all said that he did not have enough assets or business history to get a loan. Moreover, his credit report was not good. He then went to a loan broker who said the same thing. But when we spoke to the loan broker, the broker said that Chris could get the loan if both of us had title to my home and we both signed the promissory note for the loan.

19. About the same time, in about July 2021, Chris and I began couples' therapy with a licensed marriage and family therapist. Chris was still drinking excessively, and he had stopped taking his anti-depressant medication, which he did without consulting with his doctor. At that time, Chris was blaming me for his depression rather than giving credence to his depression diagnosis. This caused more stress and ill will in our relationship.

20. Notwithstanding those troubles, and because we were then married and I had

helped him build his business, Chris demanded to be put on the title of my house so he and I could use the house as an asset to secure his business loan. Because his business appeared to be doing well and had been doing well for years, I reluctantly agreed to put him on the title and to co-sign the loan.

21. The loan broker found a lender willing to make a $360,000 loan, with installment payment for a year with the last a large balloon payment. Chris believed that he would make enough money in the following year to cover the balloon payment. He told me that he would make enough money within a year to cover the balloon payment. Again, because the business has been doing well for years, I reluctantly agreed.

22. The loan when made was dated August 25, 2021 and Chris immediately put all of the loan proceeds in his business account. He was put on the title to my residence as part of the loan process.

23. Just 2-1/2 months later, almost as if Chris had planned it before I signed on to the business loan secured by my home, Chris told me on November 6, 2021 that he wanted to separate. But rather than move out of my home, he demanded that I move out of my own home. His name had just that year been put on the title, but I was the one who purchased the home and established that equity in the home. Nevertheless, he told me that I had to move out because he was still operating his business from my home and that if I did not move, he could and would sue me for loss of business income if I did not agree to move out. I reluctantly left on November 6, 2021.

24. At that time, he was angry with me over arguments that we had over the relationship. He did not like me spending time with some of my friends. He demanded that I stop seeing some of them. When I could, I helped him build his business by doing graphic design, photography, website design, packaging design, packaging sources, and shipping logistics. But when I had to attend to my own work, he would be upset at me for not being available to help. He told me that my own was not important and that if my workday ended at 5:00 pm, I should be home by 5:15 pm to help him with his business. We argued often about money, including whether his business should be paying rent for his use of the ADU and home as a workshop. After I moved out, he began stalking me and surveilling me, checking my bank

accounts and going to addresses which he found on my bank statements to look for me. He texted me that it was unfair that I had moved out (even though he had asked me to move out), that he wanted to talk about our separation and what was going on in our relationship, and that he was angry that I was not responding to him.

25. Not long after I moved out, I went on two dates.

26. On November 17, 2021, in the middle of the night at 1:32 a.m., Chris went to the house of the friend where I was staying to see whether I was there. He saw that there were surveillance cameras at my friend's house and so he left. On my friend's recording, Chris looked at the camera and immediately backed away from the house.

27. The next day (but still November 17), Chris and I attended another couples' therapy session. I was asked about an affair I was having, notwithstanding that I had not told Chris or the therapist about my dates. Only later did I realize that Chris must have discovered the dates through his surveillance activities. Chris got angry and started yelling at me and the therapist. The therapist eventually left her office, well after the session was scheduled to end, as she had another appointment elsewhere. She left us sitting in her office.

28. After the therapist left, Chris got more upset, threatening that he would hurt me and the person I was "having an affair with." He then began writing a message to the person that I had dated via social media, and as he was typing, Chris told me that he was threatening that person and that he was going to harm him. Chris got up to leave while yelling at me and using abusive language in a loud voice. He started to walk out of the office, but he turned around, came back, and punched me across the face with his fist, striking me near my left eye. The punch bruised my face and left a red swollen mark. He then grabbed my sunglasses, which had been on the couch, but they fell to the floor due to the altercation, where he stomped on them to break them. When the sunglasses did not fully break, he ripped them apart and threw the pieces of the sunglasses at me (which I dodged). He continued to yell at me. He tried to punch me again, continued to yell at me, and screamed at me that he would take my property in a divorce, notwithstanding his protestations that divorce was a disgrace. Then he threatened to follow me to wherever I was going to stay that night. Then he left.

29. I was at that time fearful that he would harm me and quite worried about where I

could go that would be safe. I chose to go to my office at 809 North Cahuenga Blvd. in Los Angeles (Cahuenga and Melrose) to get my computer, at which point I called the police to report the incident. The police came that day. There were two officers. I gave the police a report. They took photos of me. I also advised them that I intended to stay again at my friend's house, as I left safer doing so after making my report to the police and informing them of my friend's address. After the police left, I eventually left my office to go to my friend's house.

30. That same day, I checked my bank account (which Chris had access to) online and I learned that he had withdrawn $2,900 that day. I did not consent to that. I immediately called the bank, and they were able to reverse it.

31. On that same day, Chris posted on social media (Instagram, where he then had 100,000 followers due to his fame as a pastry chef) the identity of the person that I had dated along with my name, saying that I had destroyed our marriage and that my unilateral decision to end the marriage was disgraceful. He did this to incite his followers to bully me, which they did, through sending me hateful messages.

32. The next day, I applied for and obtained a temporary restraining order against Chris. At a hearing a month later, the restraining order was extended for a year.

33. Notwithstanding Chris' protestations that divorce was a disgrace, Chris unilaterally filed for divorce just five days later, on November 22, 2021, just thirteen days after he asked me to leave my own home. Chris did not allow me to regain possession of the house I owned until January 2, 2022.

34. The divorce proceeding was still pending in the fall of 2022, when Chris' business loan was set to mature on October 1, 2022. I negotiated an extension with the lender on his business loan when the balance was still about $360,000, and we executed a new note dated September 30, 2022 which extended the maturity to April 1, 2023.

35. During the divorce, I was advised that Chris was entitled to 50% of the appreciation of my home from the date he was put on the title in August 2021 and our separation on November 7, 2021. We agreed that that his half of the appreciation totaled about $150,000. I owned most of the equity in the house, but I was unable to make a lump sum payment to give Chris his appreciation in the house. Chris was unable to assume the loan on his own. Our deal

was that he would be removed from the title of the house, and in exchange I would refinance and assume his loan. We agreed that our divorce judgment would require to me to assume the business loan with a balance of about $370,000 at that time and Chris would pay me $250,000 in installment payments. My ability to assume the business loan would not be possible without the installment payments from Chris. I remain unable to service the loan without the installment payments required by our divorce judgment. Attached as **Exhibit A** is a true and correct copy of the judgment.

36. I tried to fight for community property interest in the assets he acquired during our divorce, in particular the luxury items that he spent $696,848 to acquire (based on an excel spreadsheet created of a list of transactions from his subpoenaed bank records). As they were acquired during our marriage, I should have been entitled to half of them, which I had hoped would offset the value he was owed from being on title of my house. Unfortunately, he purchased all these items with a business credit card, and the judge deemed them as business purchases. I argued that luxury bags were not a business expense for a pastry chef, but I was only granted six items out of the hundreds of items he owned. I promptly sold the six items to offset my attorneys' fees.

37. When he filed his bankruptcy petition on March 23, 2026, he stated that during the two years before March 23, 2026, he had not sold, traded, or transferred any property outside the ordinary course of business or financial affairs or made any gifts with a total value of more than $600. If that were true, then he must have transferred about $696,848 of luxury goods between our September 12, 2023 divorce, when he represented that he had those asserts, and March 23, 2024, two years before the bankruptcy petition date. His position appears to be that while he no longer possesses those goods, he did not transfer any of them before our September 12, 2023 divorce or after the start of the two-year-period before bankruptcy on March 23, 2024. In other words, he transferred all but $13,600 of the $696,848 of goods between September 12, 2023 and March 23, 2024, a six-month period. That is not plausible. Yet he claims that on March 23, 2026, all his clothing was worth more than $10,000, all his household goods, furnishings, and decor were worth no more than $3,000, and all his jewelry worth no more than $600. But from January 17, 2020 through January 18, 2023, he had four transactions of luxury goods that exceeded $10,000, 60 transactions that exceeded $3,000, and 157 transactions that exceeded

$600.

38. In the six months after our divorce was finalized, I do not believe he would have been able to or needed to sell off all these items. Moreover, he loved them and cherished them as prized possessions indicative of his success.

39. In addition, Chris took most of the furniture from our home during the divorce most of which was from Restoration Hardware, with some items costing $10,000. It is not plausible to conclude that he sold all those items and now only has $3,000 worth of furniture and decor as stated in his bankruptcy filing. (List of furniture from divorce provided.)

40. Chris is also claiming in his bankruptcy papers that he has only been employed by "Butter Love and Hardwork" or "BLHW" for the five months his bankruptcy case began, after being self-employed under his own name from 2016 to September of 2025. On Schedule B, item 19, he lists his ownership of a business named "Butter Love & Hardwork". On Schedule I, Part 1, he checks the box for "employed" and writes in "Self Employed" as the name of the employer. Similarly, on Item 27 of the Statement of Financial Affairs, he lists his own name as the business name for 2016 to September 2025 and "Butter Love and Hardwork" as the business name for September 2025 through the petition date. On page 4 of the *Chapter 13 Statement of Your Current Monthly Income and Calculation of Commitment Period*, he lists the business name as "BLHW".

41. But nowhere do the papers mention "BLHW, Inc", which he incorporated as an S-Crop in 2018, and which had filed tax returns since 2019 until our divorce. BLHW, Inc is still incorporated and active according to the California Secretary of State website.

42. On May 11, 2026, Chris photographed himself with a friend at the Fendi store on rodeo drive wearing Louis Vuitton boots showing that he owns items from his lavish collection of luxury goods. I have photos of Chris wearing items from his collection.

43. I also know that relatively recently, on May 14, 2026, Chris did a breakable chocolate project for a company named Squishmallows Fragrance. This was a national influencer campaign similar to a project he would have done while we were married that brought in from $20,000 to $50,000. I know the company, Squishmallows Fragrance, through my employment.

44. Based on the absence of assets that should be in the schedules and based on my

experience with Chris for the past twelve years, I believe that he has not disclosed all his assets. Based on the absence of income similar to the Squishmallows Fragrance project in May of this year, the successful business operations during the past ten years, and my experience with Chris fort the past twelve years, I believe that Chris has not scheduled all of his income.

45. Because Chris did not succeed in taking all of my property, as he threatened and promised to do on November 17, 2021, because Chris blamed and denigrated me for wanting to end our dysfunctional marriage, and based on my experience with him for the past twelve years, I believe that Chris is using this Chapter 13 case to hurt me. If he were to obtain confirmation of the Chapter 13 plan he proposed, he would hurt me economically and I might lose my home. I cannot continue to service the business loan I assumed to facilitate the division of our marital property without the monthly contributions that Chris promised in exchange for my getting the lenders to release him from any liability for that loan the proceeds of which went solely to him.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 5, 2026, in the City of Los Angeles, California.

Matthew Peridis

# Exhibit A

Exhibit A

Received: 9/6/2023 3:45 PM

DocuSign Envelope ID: E5A8A318-1CF6-411C-A809-8707A087FA29

FL-180

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
STEPHEN N. SHAPIRO, ESQ. (S.B.#72615)
LAW OFFICES OF STEPHEN N. SHAPIRO
16830 VENTURA BOULEVARD, SUITE 500
ENCINO, CALIFORNIA 91436
TELEPHONE NO.: (818) 990-8674 FAX NO. (Optional): (818) 981-1785
E-MAIL ADDRESS (Optional): s.shapiro@shaplawoffices.com
ATTORNEY FOR (Name): PETITIONER CHRIS FORD

FOR COURT USE ONLY
Electronically FILED
Superior Court of California
County of Los Angeles
9/12/2023 9:30 AM
David W. Slayton
Executive Officer/Clerk of Court,
By C. L. Mitchell, Deputy Clerk

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 111 NORTH HILL STREET
MAILING ADDRESS: 111 NORTH HILL STREET
CITY AND ZIP CODE: LOS ANGELES, CALIFORNIA 90012
BRANCH NAME: CENTRAL DISTRICT

MARRIAGE OR PARTNERSHIP OF
PETITIONER: CHRIS FORD
RESPONDENT: MATTHEW FORD

## JUDGMENT

[X] DISSOLUTION [ ] LEGAL SEPARATION [ ] NULLITY
[ ] Status only
[ ] Reserving jurisdiction over termination of marital or domestic partnership status
[ ] Judgment on reserved issues
Date marital or domestic partnership status ends: 09/12/2023

CASE NUMBER: 21 STFL 13789

1. [ ] This judgment [ ] contains personal conduct restraining orders [ ] modifies existing restraining orders. The restraining orders are contained on page(s) of the attachment. They expire on *(date)*:

2. This proceeding was heard as follows: [X] Default or uncontested [X] By declaration under Family Code section 2336 [ ] Contested [ ] Agreement in court
   a. Date: 09/12/2023 Dept.: 2 Room: 215
   b. Judicial officer *(name)*: Jeffrey W. Korn [ ] Temporary judge
   c. [ ] Petitioner present in court [ ] Attorney present in court *(name)*:
   d. [ ] Respondent present in court [ ] Attorney present in court *(name)*:
   e. [ ] Claimant present in court *(name)*: [ ] Attorney present in court *(name)*:
   f. [ ] Other *(specify name)*:

3. The court acquired jurisdiction of the respondent on *(date)*: JANUARY 20, 2022
   a. [ ] The respondent was served with process.
   b. [X] The respondent appeared.

**THE COURT ORDERS, GOOD CAUSE APPEARING**

4. a. [X] Judgment of dissolution is entered. Marital or domestic partnership status is terminated and the parties are restored to the status of single persons
      (1) [X] on *(specify date)*: 09/12/2023
      (2) [ ] on a date to be determined on noticed motion of either party or on stipulation.
   b. [ ] Judgment of legal separation is entered.
   c. [ ] Judgment of nullity is entered. The parties are declared to be single persons on the ground of *(specify)*:
   d. [ ] This judgment will be entered nunc pro tunc as of *(date)*:
   e. [ ] Judgment on reserved issues.
   f. The [ ] petitioner's [X] respondent's former name is restored to *(specify)*: MATTHEW EDWARD AGAPITOS PERIDIS
   g. [ ] Jurisdiction is reserved over all other issues, and all present orders remain in effect except as provided below.
   h. [ ] This judgment contains provisions for child support or family support. Each party must complete and file with the court a *Child Support Case Registry Form* (form FL-191) within 10 days of the date of this judgment. The parents must notify the court of any change in the information submitted within 10 days of the change, by filing an updated form. The *Notice of Rights and Responsibilities—Health-Care Costs and Reimbursement Procedures and Information Sheet on Changing a Child Support Order* (form FL-192) is attached.

DocuSign Envelope ID: E5A8A318-1CF6-411C-A809-8707A087FA29

FL-180

| CASE NAME *(Last name, first name of each party)*: | CASE NUMBER: |
|---|---|
| FORD, CHRIS AND FORD, MATTHEW | 21 STFL 13789 |

4\. i. ☐ The children of this marriage or domestic partnership are:
   (1) ☐ Name                     Birthdate

   (2) ☐ Parentage is established for children of this relationship born prior to the marriage or domestic partnership

j. ☐ Child custody and visitation (parenting time) are ordered as set forth in the attached
   (1) ☐ Settlement agreement, stipulation for judgment, or other written agreement which contains the information required by Family Code section 3048(a).
   (2) ☐ *Child Custody and Visitation Order Attachment* (form FL-341).
   (3) ☐ *Stipulation and Order for Custody and/or Visitation of Children* (form FL-355).
   (4) ☐ Previously established in another case. Case number:                 Court:

k. ☐ Child support is ordered as set forth in the attached
   (1) ☐ Settlement agreement, stipulation for judgment, or other written agreement which contains the declarations required by Family Code section 4065(a).
   (2) ☐ *Child Support Information and Order Attachment* (form FL-342).
   (3) ☐ *Stipulation to Establish or Modify Child Support and Order* (form FL-350).
   (4) ☐ Previously established in another case. Case number:                 Court:

l. ☒ Spousal, domestic partner, or family support is ordered:
   (1) ☐ Reserved for future determination as relates to ☐ petitioner ☐ respondent
   (2) ☒ Jurisdiction terminated to order spousal or partner support to ☒ petitioner ☒ respondent
   (3) ☐ As set forth in the attached *Spousal, Partner, or Family Support Order Attachment* (form FL-343).
   (4) ☐ As set forth in the attached settlement agreement, stipulation for judgment, or other written agreement.
   (5) ☐ Other *(specify)*:

m. ☒ Property division is ordered as set forth in the attached
   (1) ☒ Settlement agreement, stipulation for judgment, or other written agreement.
   (2) ☐ *Property Order Attachment to Judgment* (form FL-345).
   (3) ☐ Other *(specify)*:

n. ☒ Attorney fees and costs are ordered as set forth in the attached
   (1) ☒ Settlement agreement, stipulation for judgment, or other written agreement.
   (2) ☐ *Attorney Fees and Costs Order* (form FL-346).
   (3) ☐ Other *(specify)*:

o. ☒ Other *(specify)*: SEE ATTACHMENT FL-180 4.o.

Each attachment to this judgment is incorporated into this judgment, and the parties are ordered to comply with each attachment's provisions. Jurisdiction is reserved to make other orders necessary to carry out this judgment.

Date:                              XXX XXX
                                   JUDICIAL OFFICER

5\. Number of pages attached: 16          ☒ SIGNATURE FOLLOWS LAST ATTACHMENT

**NOTICE**

Dissolution or legal separation may automatically cancel the rights of a spouse or domestic partner under the other spouse's or domestic partner's will, trust, retirement plan, power of attorney, pay-on-death bank account, transfer-on-death vehicle registration, survivorship rights to any property owned in joint tenancy, and any other similar property interest. It does not automatically cancel the rights of a spouse or domestic partner as beneficiary of the other spouse's or domestic partner's life insurance policy. You should review these matters, as well as any credit cards, other credit accounts, insurance policies, retirement plans, and credit reports, to determine whether they should be changed or whether you should take any other actions.
A debt or obligation may be assigned to one party as part of the dissolution of property and debts, but if that party does not pay the debt or obligation, the creditor may be able to collect from the other party.
An earnings assignment may be issued without additional proof if child, family, partner, or spousal support is ordered.
Any party required to pay support must pay interest on overdue amounts at the "legal rate," which is currently 10 percent.

ATTACHMENT FL-180 4.o.
CHRIS FORD AND MATTHEW FORD
LOS ANGELES SUPERIOR COURT CASE NO. 21 STFL 13789

This Stipulated Judgment for Dissolution of Marriage is entered into by and between Petitioner, Chris Ford and Respondent, Matthew Ford. This Judgment is being entered after the parties reached an agreement with respect to all issues in dispute at the Informal Settlement Conference held on May 2, 2023, before the Honorable Amy Pellman, Judge of the Los Angeles Superior Court.

It is hereby stipulated by and between Petitioner, Chris Ford, and Respondent, Matthew Ford, that the Court enter this Judgment For Dissolution of Marriage. Based upon said Judgment, and for good cause appearing therefor, it is hereby adjudged, ordered and decreed as follows:

**A. Recitals**

1. Petitioner, Chris Ford, and Respondent, Matthew Ford, were married on January 13, 2020 and they separated on November 6, 2021. The length of the marriage was 1 year and 9 months.

2. On November 22, 2021, Petitioner filed a Petition For Dissolution of Marriage and on January 20, 2022, Respondent filed a Response and Request for Dissolution of Marriage

3. The parties have no children.

**B. Settlement of Claims Between the Parties**

1. The Court finds that the parties have adjusted by and between themselves all present and future rights of every kind and nature whether relating to spousal support, community property, quasi-community property, separate property, division of assets and debts, attorney fees and costs, claims for reimbursement and/or credits or any other claims either party may have or claim to have against the other party.

2. The Court finds that except as is otherwise set forth herein, the parties have agreed that the provisions of this Stipulated Judgment For Dissolution of Marriage (hereinafter "Judgment") are in full satisfaction of any known claim either party may have against the other party.

///

///

DocuSign Envelope ID: E5A8A318-1CF6-411C-A809-8707A087FA29

C. **Waiver of Spousal Support**

1. The Court finds and Petitioner and Respondent have acknowledged that they each forever waive and release any and all right to claim or receive spousal support, maintenance or alimony from the other party at any time. The Court further finds that each party has released and discharged the other party from any and all obligations, statutory or otherwise, to provide spousal support, maintenance or alimony to the other. The Court further finds that no spousal support arrearages are owed by either party to the other party. The parties understand that by waiving spousal support, they are forever precluded from requesting spousal support from the other party at any time in the future and that this mutual waiver is not subject to modification. The Court does not retain jurisdiction over the issue of spousal support and the Court does not retain jurisdiction to extend or order any payments of spousal support from either party to the other party.

2. The Court finds that the parties have carefully bargained in this Judgment concerning all issues relating to spousal support, its duration, and whether or not it should be extendable. The termination of spousal support is absolute. This Judgment cuts off forever the right of either one of the parties to ask for spousal support payments, the power of any Court to order spousal support payments, and the right of the other party to receive spousal support payments. No Court has jurisdiction to extend or order any spousal support payments. Petitioner and Respondent have each acknowledged that they have been advised that this section regarding spousal support may work great and unexpected hardship on one or both of the parties, and the parties have considered and acknowledged that possibility in electing to terminate spousal support forthwith.

3. The Court finds that Petitioner has consulted with his legal counsel concerning the meaning and importance of this spousal support waiver and the irrevocable and non-modifiable nature of the spousal support termination provided herein. The Court finds that Petitioner fully understands that no change of circumstances or other event will permit or allow Petitioner to seek spousal support from Respondent at any time.

C.F.

///

///

DocuSign Envelope ID: E5A8A318-1CF6-411C-A809-8707A087FA29

4. The Court finds that Respondent has consulted with his legal counsel concerning the meaning and importance of this spousal support waiver and the irrevocable and non-modifiable nature of the spousal support termination provided herein. The Court finds that Respondent fully understands that no change of circumstances or other event will permit or allow Respondent to seek spousal support from Petitioner at any time.

DS
M.F.

5. The Court finds that the parties have acknowledged and agreed that they have carefully bargained in this Judgment for the mutual waiver of spousal support and that said waiver is an integral part of their negotiations, and an integral part of the terms and conditions of this Judgment. The Court finds that the parties have acknowledged, each to the other, that they understand that such relinquishment of the right to spousal support is permanent and may not be resurrected for any purpose whatsoever, notwithstanding what their economic or physical condition is now or may be in the future. The parties have knowingly intended to and have hereby permanently waived any right they may have, for spousal support or the equivalent thereto from the other.

6. The Court finds that the parties further acknowledge that they are familiar with the legal import of the case of *In re Marriage of Vomacka* (1984) 36 Cal.3d 459 and those cases that follow its principle. The Court further finds that the provisions here are intended to comply with the requirements of *In re Marriage of Brown* (1995) 35 Cal. App.4th 785, and *In re Marriage of Iberti* (1997) 55 Cal. App.4th 1434, to make clear that no Court shall have the authority to award spousal support to Petitioner or Respondent at any time. Understanding the meaning of these three cases, the parties agree that under no circumstances is any Court in the future able to extend spousal support payments to either party.

C.F. DS
C.F. M.F.

///

///

**D. Division of Community Property and Confirmation of Separate Property**

The Court finds that the Parties have agreed upon the award and confirmation of property as set forth in this Stipulated Judgment and accept the same as the division of their property to avoid litigation and further expense and to resolve this matter by settlement. The Parties agree and the Court finds that many of the assets set forth herein have either (1) not been formally appraised by experts retained by the Parties and/or (2) are difficult to value; notwithstanding same, the Parties knowingly, voluntarily, and willingly agree to enter into this Stipulated Judgment.

1. **Property Awarded To Petitioner**

Petitioner is awarded the following property as his sole and separate property and he is ordered to pay any encumbrance thereon and to appear on behalf of, defend, indemnify, and hold Respondent harmless therefrom:

a. The 2019 Tesla Model S (leased), California license plate no. 9DJG819.

b. The 2019 Ural Motorcycle Side Car, California VIN no. X8JMHO377KU229332.

c. The Wells Fargo Bank savings account no. xxx1350.

d. The Wells Fargo Bank checking account no. xxx4857.

e. Any and all other checking, savings, money market, credit union and/or other financial accounts standing in Petitioner's name and all funds on deposit therein.

f. Any and all interest in the business known as ButterLove&HardWork, Inc. also known as BLHW, Inc., including, but not limited to, all assets (equipment, materials, bank accounts, including Wells Fargo Simple Business Checking account no. ending in 3929, accounts receivable, and goodwill) and any and all debts, obligations and liabilities pertaining thereto, including American Express credit card no. ending in 1008.

g. Any and all furniture, furnishings, appliances, clothing, jewelry, personal effects, luxury items, and other personal property currently in Petitioner's possession with the exception of the following six (6) luxury items which are awarded to Respondent: 1) the Louis Vuitton mirror keepall bandouliere, 2) the Louis Vuitton mirror handle soft trunk, 3) the Louis Vuitton clutch box monogram macassar, 4) the Louis Vuitton cheese hat; 5) the Louis Vuitton silver

DocuSign Envelope ID: E5A8A318-1CF6-411C-A809-8707A087FA29

raincoat; and 6) the Louis Vuitton petit malle and the 56 color Polaroid photos of celebrities. Petitioner shall deliver these luxury items and the Polaroid photos to the Salick Family Law Group, APLC no later than 7 days from the date that both parties and both counsel execute this Judgment. The luxury items and Polaroid photos described in this section shall be in good condition at the time of delivery.

2. **Property Awarded To Respondent**

Respondent is awarded the following property as his sole and separate property and he is ordered to pay any encumbrance thereon and to appear on behalf of, defend, indemnify, and hold Petitioner harmless therefrom:

a. Any and all interest in the real property located at 1205 S. Genesee Avenue, Los Angeles, California 90019, including all debts, obligations and liabilities pertaining thereto, legally described as follows:

> The real property in the City of Los Angeles, County of Los Angeles, State of California, described as:
>
> THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:
>
> LOT 12, BLOCK F, TRACT 4362, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 48, PAGES 53 TO 54 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

APN: 5086-017-012

b. The 2011 Toyota Prius, California license plate no. 7KUD303.

c. The 2022 Chevrolet Bolt, California VIN xxx1886.

d. The Wells Fargo Bank checking account no. xxx3135.

e. The T-Mobile checking account no. xxx2209.

f. Any and all other checking, savings, money market, credit union and/or other financial accounts standing in Respondent's name and all funds on deposit therein.

g. Any and all furniture, furnishings, appliances, clothing, jewelry, personal effects, luxury items and other personal property currently in Respondent's possession.

///

DocuSign Envelope ID: E5A8A318-1CF6-411C-A809-8707A087FA29

h. The following items set forth in Paragraph D.1.h. that are currently in Petitioner's possession: 1) the Louis Vuitton mirror keepall bandouliere, 2) the Louis Vuitton mirror handle soft trunk, 3) the Louis Vuitton clutch box monogram macassar, 4) the Louis Vuitton cheese hat; 5) the Louis Vuitton silver raincoat; and 6) the Louis Vuitton petit malle and the 56 color Polaroid photos of celebrities. Petitioner shall deliver the above luxury items and Polaroid photos to the Salick Family Law Group, APLC no later than 7 days from the date that both parties and both counsel execute this Judgment. The luxury items and Polaroid photos described in this section shall be in good condition at the time of delivery.

E. **Debts and Obligations**

1. Petitioner shall assume, pay, defend and hold Respondent harmless from the following credit cards, loans and/or other debts, obligations and/or liabilities:

a. The Wells Fargo Visa account no. xxx0957-2533.

b. Chase credit card account no. xxx3004-8460.

c. Chase credit card account no. xxx5354-9715.

d. The Restoration Hardware credit card account no. xxx9729.

e. Any and all other credit cards and/or any and all other debts, obligations and/or liabilities in Petitioner's name, including all loan(s) from Patricia Ford.

2. Respondent shall assume, pay, defend and hold Petitioner harmless from the following credit cards, loans and/or other debts, obligations and/or liabilities:

a. The Chase credit card account no. xxx6888.

b. The Chase credit card no. xxx9312.

c. The Capital One credit card no. xxx7168.

d. The balance of monthly service charges, if any, and the balance of any charges due for the equipment from Vivint Security Systems for the security system located at 1205 S. Genesee Avenue, Los Angeles, California 90019 from January 3, 2022 to present.

e. Any and all charges by the City of Los Angeles Police Department for responding to false alarms at the residence located at 1205 S. Genesee Avenue, Los Angeles, California 90019, after January 3, 2022.

DocuSign Envelope ID: E5A8A318-1CF6-411C-A809-8707A087FA29

f. Any and all other credit cards and/or any and all other debts, obligations and/or liabilities in Respondent's name.

**F. <u>Equalization Payment</u>**

1. In order to equalize the division of the parties' community property assets and debts including the Paramount Residential Mortgage Group, Inc. loan no. xxx3045 (formerly the Val-Chris Investment loan) and any claims by either party for credits and/or reimbursements either party may have against the other party, Petitioner shall pay to Respondent the sum of $250,000 payable as follows: Petitioner shall pay to Respondent the minimum sum of $2,900 per month commencing on June 15, 2023 and continuing on the 15th day of each month thereafter until the last installment payment made on May 15, 2027, for a total of forty eight (48) months. In the event that any two (2) consecutive installment payments from Petitioner to Respondent are more than five (5) days late, the entire remaining balance shall become immediately due and payable and shall then accrue legal interest at the rate of ten percent (10 %) per annum. When the last installment payment of $2,900 is due on May 15, 2027, Petitioner shall have paid to Respondent the cumulative sum of $250,000 as and for the equalization payment. The parties hereto stipulate and agree that the foregoing division of the parties' assets and debts constitutes an equalization of the parties' assets and debts and any claims by either party for credits and/or reimbursements either party may have against the other party.

2. The equalization payment is being paid pursuant to <u>Internal Revenue Code, Section 1041</u> and comparable provisions of California law, and is intended to be non-taxable to Petitioner and non-deductible to Respondent.

**G. <u>Encumbrances</u>**

Except as otherwise expressly provided for herein, all other property awarded or confirmed hereunder is awarded or confirmed subject to all existing encumbrances and liens thereon. The party receiving such property shall indemnify and hold the other party free and harmless from any claim or liability that the other party may suffer or may be required to pay on account of such encumbrances or liens assumed by the receiving party and from all costs and expenses related thereto, including, but not limited to, attorneys' fees and court costs incurred in connection therewith.

DocuSign Envelope ID: E5A8A318-1CF6-411C-A809-8707A087FA29

**H. <u>Insurance</u>**

Except as otherwise expressly provided for herein, all existing insurance on property being awarded or confirmed hereunder is assigned to the party receiving such property. All insurance premiums due shall be paid by the party to whom the insurance is assigned, except as otherwise expressly provided for herein.

**I. <u>Warranty Regarding Debts & Obligations</u>**

Except as otherwise specifically provided for herein, the Court finds that each party has warranted to the other that he has not incurred and will not incur any debts, liabilities or obligations as to which the other is, or may be, liable other than the encumbrances and obligations referred to in this Judgment. Except as otherwise specifically provided for herein, any and all such debts, liabilities or obligations incurred by either party and not expressly referred to in this Judgment shall be the obligation of the party incurring such debts, liabilities or obligations, and the incurring party shall release the other from any and all such debts, liabilities and obligations and shall indemnify and hold the other party harmless therefrom. Further, the party incurring any such debts, liabilities or obligations not referred to in this Judgment shall, at his sole expense, defend the other against any claim, action or demand, or threat thereof, brought seeking to hold the other liable thereon, whether or not well founded, and shall hold the other harmless therefrom, together with reasonable attorneys' fees and costs incurred in connection with any defense thereof.

**J. <u>Attorneys' Fees and Costs</u>**

Each party shall pay their own respective attorney fees and costs incurred in connection with the parties' Dissolution of Marriage proceeding, including the preparation of this Judgment for Dissolution of Marriage through the entry of Judgment.

**K. <u>Notice Re Prior Estate Plan Documents</u>**

Each party is aware of California Family Code §2024 advising that parties to a dissolution of Marriage should review their wills, insurance policies, retirement benefit plans, credit cards, credit accounts, credit reports, and other matters that they may wish to change and review all property rights and employment benefits that have survivorship or inheritance factors (including without limitation, life insurance, pension, trusts, jointly held real estate and personal property, and bank

DocuSign Envelope ID: E5A8A318-1CF6-411C-A809-8707A087FA29

accounts) to ensure that each expresses the present intent of the parties, particularly with respect to life and beneficiary designations.

**L. <u>Tax Returns</u>**

1. **<u>Prior Years Tax Returns</u>:** Except as otherwise provided for herein, if any deficiency (including taxes, interest and/or penalties) is assessed by the Internal Revenue Service or the California Franchise Tax Board or any other State Taxing Authority against the parties with respect to the filing of any joint income tax returns during marriage including calendar years 2019 and 2020, such deficiency and the cost of defending against any such deficiency, including any accounting/attorneys' fees and costs, shall be paid equally by the parties.

2. **<u>2021 Income Tax Returns and Future Income Tax Returns</u>:** The Court further orders that for the calendar year 2021 and for all subsequent years thereafter, the parties shall file separate or single status State and Federal income tax returns and shall indemnify and hold each other harmless from and against any tax liability attributable to the income and expenses reported.

3. **<u>Communication and Notices</u>**: The Court further orders that the parties send to each other, within five (5) business days of receipt, copies of all communications regarding any joint tax returns or declarations of estimated tax, including any tax audit notice or deficiency assessment from any taxing authorities. Each of the parties shall have the right to participate in any audit and to name and pay for separate accountants and/or tax counsel in the event that they are unable to agree on a joint representative regarding any jointly filed tax return. The parties are also ordered to cooperate fully with each other, to execute any documents reasonably requested, and to furnish information and testimony to any taxing authority.

**M. <u>Tax Basis</u>**

1. The Court finds that the parties agree that under Internal Revenue Code Section 1041, or the tax principles regarding interspousal division of community property, the allocation of property between the parties under this Judgment is not taxable, and the tax basis of each asset allocated under these provisions has not changed, and will not change, by reason of this division.

2. Each party is ordered not to seek a new tax basis for any asset grounded on any such change even though the transaction may otherwise appear to be a bona fide sale.

DocuSign Envelope ID: E5A8A318-1CF6-411C-A809-8707A087FA29

**N. Waivers and Releases**

Except as specifically set forth hereinabove, the Court finds that all claims the parties may have against each other, if any, and whensoever created or for whatever purpose incurred, are waived by the parties, and the parties waive, release, relinquish, and forbear from pursuing any and all claims for reimbursement and/or credits, regardless of the nature or kind, including but not limited to the following:

1. Claims for any settlement and/or equalizing payment from Petitioner to Respondent or from Respondent to Petitioner for the division of community property, except as specifically set forth herein.

2. Claims against either party for reimbursement for unauthorized gifts of community property or unauthorized transfers of community property for less than adequate consideration or for less than fair and reasonable value, or for any other breach of fiduciary duty or confidential relationship between the parties.

3. Claims against either party for reimbursement to the community property estate for the improvement or investment of community property assets or separate property assets.

4. Any and all other reimbursement rights, advancements or claims that Petitioner or Respondent may have even though not specifically set forth herein, including but not limited to any and all claims for retroactive spousal support, temporary or permanent, claims for advancements, or claims that Petitioner or Respondent may have against one another, although not specifically identified herein.

5. The identification of specific categories shall not limit the generality of the release and waiver provisions as set forth herein with respect to claims for reimbursements and/or credits.

**O. Credits and/or Reimbursements**

The parties have waived any and all claims for reimbursement and/or credits either party may have against the other party, including but not limited to each of the following:

1. Epstein credits (In re Marriage of Epstein (1979) 24 Cal.3d 76) and all rights to reimbursement to which a Party may be entitled to as a result of the payment of community obligations since November 6, 2021, the date of separation of the parties.

DocuSign Envelope ID: E5A8A318-1CF6-411C-A809-8707A087FA29

2. Watts charges (In re Marriage of Watts (1985) 171 Cal.App.3d 366) and all rights to reimbursement to which a Party may be entitled to as a result of one Party's use of community assets since November 6, 2021, the date of separation of the parties

3. Jeffries claims (In re Marriage of Jeffries (1991) 228 CA3d 548) and all rights to request a credit for mortgage payments made during separation and charges for reasonable rental value of the residence during separation.

4. Reimbursement of separate property contributions to property acquisitions, per Family Code Section 2640.

**P. After Discovered Property**

1. Petitioner and Respondent warrant, one to the other, that neither of them knows or has any information of any property of any kind or description, of the parties, or either of the parties, except that which is set forth in this Judgment. Respondent warrants to Petitioner and Petitioner warrants to Respondent that warrantor has not concealed, withheld, or made, without the knowledge or consent of the other, any gift, transfer, conveyance, or assignment of any property, not specifically disclosed to the other herein.

2. No waiver or release approved by or made an order of the Court, shall prevent a party from asserting a claim to his interest in any undisclosed or undivided community or quasi-community property.

3. All community property or quasi-community property discovered after the date of entry of Judgment or otherwise omitted in this Judgment shall be determined and divided pursuant to Family Code Sections 721, 1100, 1101, 2100, 2113, and 2120-2129, inclusive.

4. The Court reserves jurisdiction to make disposition of any and all after-discovered and/or undistributed community and/or quasi-community property not otherwise disposed of by this Judgment.

///

///

///

///

DocuSign Envelope ID: E5A8A318-1CF6-411C-A809-8707A087FA29

**Q. Additional Documents**

Each party shall, at any time or times hereafter, do any and all acts and make, execute, and deliver any and all documents and instruments, including quitclaim or other deeds, as the other party shall reasonably require for the purpose of evidencing this Judgment or effectuating its purpose and intent. If either party fails or refuses to execute any document necessary to effectuate the terms of this Judgment, within forty-eight (48) hours after request by the other party, on ex-parte application to the Superior Court (with 24-hour telephonic notice of application to the other party), the Clerk of said Court shall be appointed to execute the documents on behalf of the defaulting party.

**R. No Tax Advice by Counsel**

The parties acknowledge that there may be certain tax consequences arising from the parties entering into this Judgment, that no attorney has furnished any tax advice with respect to this Judgment, that each party has been advised to obtain independent tax advice from tax attorneys and/or qualified accountants prior to signing this Judgment, and that they have had ample opportunity to do so and have either received sufficient advice and information to their complete satisfaction or have otherwise declined to do so.

**S. Stipulated Findings**

The Court finds:

**Final Settlement:** It is the Parties' mutual desire and wish to immediately effect by this Judgment a full, complete, and final settlement of all of their respective present and future property interests, including spousal support, and to irrevocably adjust and determine forever all legal obligations of any nature which may exist with respect to each other and by the reason of their Marriage, and to fully and completely resolve any and all issues related to their Marriage.

**T. Legal Representation**

1. The Court finds that Petitioner has retained and is represented by the Law Offices of Stephen N. Shapiro, by Stephen N. Shapiro, Esq.; that Petitioner has read this Stipulated Judgment for Dissolution of Marriage and has had ample opportunity to seek legal advice as to the contents of this Judgment; that he has had its contents fully explained to him by his counsel; that he is fully aware of and understands its terms, contents, legal effects, and consequences; and that he has agreed

DocuSign Envelope ID: E5A8A318-1CF6-411C-A809-8707A087FA29

to its terms and contents and entered into this Judgment knowingly, voluntarily, and free from duress, fraud, undue influence, coercion or misrepresentation of any kind.

C.F.

2. The Court finds that Respondent has retained and is represented by the Salick Family Law Group, APLC, by Nicholas A. Salick, Esq.; that Respondent has read this Stipulated Judgment for Dissolution of Marriage and has had ample opportunity to seek legal advice as to the contents of this Judgment; that he has had its contents fully explained to him by his counsel; that he is fully aware of and understands its terms, contents, legal effects, and consequences; and that he has agreed to its terms and contents and entered into this Judgment knowingly, voluntarily, and free from duress, fraud, undue influence, coercion or misrepresentation of any kind.

DS

M.F.

3. The Court finds that the parties acknowledge and agree that they have read this Stipulated Judgment and fully understand the contents of this document and its provisions and ramifications.

**U. <u>Discovery</u>**

1. Petitioner has acknowledged and agreed that he has had full and fair opportunity to utilize formal discovery procedures and the services of forensic accountants, appraisers, and other experts to inquire into the assets, liabilities and contentions of Respondent. Petitioner has acknowledged that he has done as much investigation as he has desired or deemed prudent with regards to the existence of assets, liabilities, the character of assets and the value of assets. Petitioner has entered into this Judgment with the knowledge that he had the right to undertake further formal discovery and he specifically, as his own voluntary act, waived that right to further formal discovery. Petitioner has acknowledged that he is satisfied with the information he has obtained from Respondent and that he does not desire, nor has he requested, any further discovery or documents from Respondent. Respondent has not promised or threatened anything to persuade or dissuade Petitioner from inquiry or investigation. Petitioner waives his right to engage in any further discovery.

DocuSign Envelope ID: E5A8A318-1CF6-411C-A809-8707A087FA29

2. Respondent has acknowledged and agreed that he has had full and fair opportunity to utilize formal discovery procedures and the services of forensic accountants, appraisers, and other experts to inquire into the assets, liabilities and contentions of Petitioner. Respondent has acknowledged that he has done as much investigation as he has desired or deemed prudent with regards to the existence of assets, liabilities, the character of assets and the value of assets. Respondent has entered into this Judgment with the knowledge that he had the right to undertake further formal discovery and he specifically, as his own voluntary act, waived that right to further formal discovery. Respondent has acknowledged that he is satisfied with the information he has obtained from Petitioner and that he does not desire, nor has he requested, any further discovery or documents from Petitioner. Petitioner has not promised or threatened anything to persuade or dissuade Respondent from inquiry or investigation. Respondent waives his right to engage in any further discovery.

3. Petitioner and Respondent each represent and warrant to the other that he is not aware of any material obligations of Petitioner or Respondent incurred prior to the date of their separation, other than the obligations described in this Judgment.

4. The Court finds that upon the execution of this Judgment, each party is deemed notified and aware that even though an obligation is to be assigned to or assumed by one party as part of the award and confirmation of property, in the event that such party defaults on the contract or obligation, the creditor may have a cause of action against the other party.

5. Petitioner and Respondent each represent and warrant that the preliminary and final Declarations of Disclosure have been completed and exchanged.

**V. Acknowledgments**

1. The Court finds that each of the parties has represented that each has carefully read each of the provisions of this Judgment, is fully aware of the content and legal effect of this Judgment, and fully and completely understands each of the provisions of this Judgment.

///

///

///

DocuSign Envelope ID: E5A8A318-1CF6-411C-A809-8707A087FA29

2. The Court finds that each of the parties has represented that he has entered into this settlement of this action voluntarily and free of any duress, undue influence, or presently known or suspected fraud and that both parties are competent to enter into this Judgment.

3. The Court finds that Petitioner acknowledges (a) that Respondent has obtained no advantage over him as a result of the agreement that forms the basis for this Judgment, (b) that there is sufficient consideration for Petitioner's entry into this agreement that forms the basis of this Judgment, and (c) that Petitioner was not under any undue influence in entering into this Judgment.

4. The Court further finds that Respondent acknowledges (a) that Petitioner has obtained no advantage over him as a result of the agreement that forms the basis for this Judgment, (b) that there is sufficient consideration for Respondent's entry into this agreement that forms the basis of this Judgment, and (c) that Respondent was not under any undue influence in entering into this Judgment.

5. The Court further finds that each party further acknowledges (a) that all negotiations leading to this Judgment were carried out at arm's length, and (b) that each party recognizes that his interests were adverse during such negotiations.

**W. Jurisdiction And Waivers**

1. The Superior Court of California, County of Los Angeles, retains jurisdiction over the parties and their property in their Dissolution of Marriage proceeding to settle any disputes arising from or to interpret this Judgment, to dispose of any after-discovered property and to make any further orders necessary to enforce the provisions of this Judgment.

2. The Court finds that the parties have waived findings of fact and conclusions of law (or alternatively, a Statement of Decision), the right to move for a new trial and the right to appeal.

3. The parties may not alter, amend or modify this Judgment except by an instrument in writing executed by both Parties.

///

///

///

///

DocuSign Envelope ID: E5A8A318-1CF6-411C-A809-8707A087FA29

X. **Execution of Judgment**

This Stipulated Judgment may be executed by facsimile signature or an electronic signature and in any number of counterparts, each of which shall be deemed an original and all of which shall together constitute one and the same agreement.

APPROVED AS CONFORMING TO THE AGREEMENT OF THE PARTIES:

Dated: 9/6, 2023

CHRIS FORD, PETITIONER

Dated: 9/6/2023, 2023

DocuSigned by:

MATTHEW FORD, RESPONDENT

APPROVED AS TO FORM ONLY:

THE LAW OFFICES OF STEPHEN N. SHAPIRO

Dated: 9/6, 2023

By: Stephen N. Shapiro

STEPHEN N. SHAPIRO, ESQ.
ATTORNEY FOR PETITIONER,
CHRIS FORD

SALICK FAMILY LAW GROUP, APLC

Dated: 9/5/2023, 2023

By: DocuSigned by: Nicholas A. Salick

NICHOLAS A. SALICK, ESQ.
ATTORNEY FOR RESPONDENT,
MATTHEW FORD

IT IS SO ORDERED:

Dated: 09/09/2023

Jeffrey W. Korn
Jeffrey W. Korn
COMMISSIONER

JUDGE OF THE SUPERIOR COURT